Argued and submitted March 14, affirmed in part, reversed and remanded in part August 10, LCDC's reconsideration and 1000 Friends' reconsideration denied November 18, both petitions for review allowed December 28, 1983 (296 Or 236) See 298 Or 574, 694 P2d 965 (1985) reconsideration on attorney fees denied December 9, 1983, petition for review denied January 17, 1984 (296 Or 350)

CITY OF SALEM et al,
*Respondents,*

*v.*

FAMILIES FOR RESPONSIBLE
GOVERNMENT, INC. et al,
*Petitioners.*

(CA A25302 (Control))

1000 FRIENDS OF OREGON,
*Petitioner,*

*v.*

CITY OF SALEM et al,
*Respondents.*

(CA A25375)
(Cases Consolidated)

668 P2d 395

Robert E. Stacey, Jr., Portland, argued the cause and filed the brief for petitioner 1000 Friends of Oregon.

Corinne C. Sherton, Salem, filed the brief for petitioners Families for Responsible Government, Inc., James G. Tryon, David Pulliam, Donald Sutherland, Donald Earle, Michael J. Tryon, Emil V. Valish, Tomi Kellogg and David Stepp.

Jeannette M. Launer, Assistant City Attorney, Salem, argued the cause for respondent City of Salem. With her on the brief was William J. Juza, City Attorney, Salem.

Richard L. Wasserman, Assistant Attorney General, Salem, argued the cause for respondent Land Conservation and Development Commission. With him on the brief were Dave Frohnmayer, Attorney General, Stanton F. Long, Deputy Attorney General, and William F. Gary, Solicitor General, Salem.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

GILLETTE, P. J.

### GILLETTE, P. J.

In these consolidated cases, Families for Responsible Government (FGR) and 1000 Friends of Oregon seek judicial review of an order from the Land Conservation and Development Commission (LCDC or the Commission) acknowledging the Salem Area Comprehensive Plan as in compliance with the statewide land use planning goals. We find no reversible error with respect to the issues raised by Families for Responsible Government. 1000 Friends of Oregon, however, points out numerous defects in the portions of the order approving the city's decision to include certain lands within its Urban Growth Boundary (UGB). Accordingly, we reverse and remand the order to LCDC.

The City of Salem first requested acknowledgment of its comprehensive plan on September 28, 1978. 1000 Friends filed objections pursuant to ORS 197.251. LCDC reviewed the plan and concluded, *inter alia,* that the city's urban growth boundary violated Goal 14 (Urbanization). The Commission entered an order granting the city an additional 120 days to bring the plan into compliance. On January 14, 1981, the city made its second acknowledgment request. 1000 Friends again filed objections, and LCDC again found that the city had impermissibly included certain lands within the UGB. The city was given additional time to correct the defects. On April 15, 1982, the city submitted its plan to LCDC for the third time. Both 1000 Friends and FRG filed objections. Nonetheless, on May 26, 1982, LCDC issued an order acknowledging the plan to be in compliance with the statewide planning goals. Both FRG and 1000 Friends seek review, assigning between them 18 errors.

### I. FRG'S CONTENTIONS

FRG's first two assignments concern (1) the city's decision to include a parcel of land known as Area III[1] within the UGB and (2) the city's failure to list the Chemawa Indian School as a "cultural area" pursuant to Goal 5 (Open Spaces, Scenic and Historic Areas and Natural Resources).

---

[1] The first time the City of Salem submitted its comprehensive plan to LCDC, the Commission found that the city had failed to justify its inclusion of a number of areas into the UGB. In order to clarify discussion of those areas for the second review, the city designated them by Roman numerals as Areas I through XIV. The majority of the issues raised by this appeal involve these areas; we use the Roman numeral designations throughout the opinion.

█ FRG first made objections with respect to these two issues when the plan was before LCDC for the third time. LCDC refused to consider the objections, because FRG had not raised them during either of LCDC's previous plan reviews. We hold that the Commission's refusal was within the range of its discretion.

Like other agencies, LCDC has the authority to regulate the conduct of proceedings before it. *See, e.g., Marbet v. Portland Gen. Elect.,* 277 Or 447, 561 P2d 154 (1977). If the Commission chooses to adopt a policy that participants in the planning process waive objections by failing to raise them at the first feasible stage of the acknowledgment process, it is within the agency's authority to do so. As far as we can tell, petitioner could have raised its Area III and Chemawa Indian School objections during LCDC's second acknowledgment review.[2] Its failure to do so relieved LCDC of responsibility to consider the objections during the third review.

█ FRG's final assignment of error—that the plan violates Goal 2 because "Marion County's[3] implementing ordinances are internally conflicting and inadequate to carry out the plan"— is not presented with sufficient specificity for us to be able to decide the question it raises. With one exception,[4]

---

[2] Area III was not considered as a separate parcel until the City of Salem's second acknowledgment request. However, FRG could have objected to its inclusion at that time.

[3] This assignment refers to county ordinances that govern the uses of land between the Salem city limits and the UGB. FRG does not urge deficiencies in the Salem ordinances.

[4] Petitioner's one specific claim is that there are no criteria to govern the approval of conditional use permits. The county's conditional use ordinance states:

"A conditional use is an activity which is basically similar to other uses permitted in the zone, but due to some of the characteristics of the conditional use, which are not entirely compatible with the zone, such use could not otherwise be permitted in the zone. A public hearing and review of the proposed conditional use by the Planning Commission or Hearings Officer will insure that the use will be in consonance with the purpose and intent of the the zone."

Solid waste disposal sites are allowed as conditional uses in all zones. FRG points out that the definition of "solid waste disposal site" describes a use similar in nature only to industrial zone uses and argues that, because most of the zoning ordinances do not contain statements of "purpose and intent," there are, effectively, no criteria for the Planning Commission or hearings officers to apply. We disagree.

First, the commission or hearings officer must compare the solid waste disposal site proposal with the types of uses permitted outright in the zone to determine

petitioner's argument fails to explain how the ordinances conflict and are deficient; it is not our function to conduct an independent review of the plan in search of inadequacies.

## II. 1000 FRIENDS' CONTENTIONS

1000 Friends' first assignment states that LCDC erred by approving a UGB containing more land than the city needs for future growth, without adopting findings to demonstrate that the excess lands are "committed" to urban use. Because each allegedly "unnecessary" piece of land is the subject of a later, separate assignment of error, we consider each area in its own factual context and make no separate ruling on petitioner's first contention.

In order to understand 1000 Friends' complaints about individual areas, however, we must first understand the process that a planning body uses to decide how much, and which, land to include within its urban growth boundary.

Goal 14 requires that UGBs "be established to identify and separate urbanizable land from rural land." The boundaries must be "based upon consideration of" seven factors listed in the goal:

"(1)  Demonstrated need to accommodate long-range urban population growth requirements consistent with LCDC goals;

"(2)  Need for housing, employment opportunitites, and livability;

"(3)  Orderly and economic provision for public facilities and services;

"(4)  Maximum efficiency of land uses within and on the fringe of the existing urban area;

"(5)  Environmental, energy, economic and social consequences;

---

whether the former is "basically similar" to the latter. Then the commission or hearings officer must determine whether the proposed disposal site is consistent with the "purpose and intent" of the zone. A statement of purpose and intent is not necessary to enable the hearings officer to make such a determination; purpose and intent may be ascertained from the name of the zone and the use permitted outright in the zone. Because a hearings officer may only approve the development of a solid waste disposal site on the basis of findings of "basic similarity" and "consonance with the purpose and intent of the zone," the conditional use ordinances do not lack sufficient criteria to ensure goal compliance.

"(6)  Retention of agricultural land as defined, with Class I being the highest priority for retention and Class VI the lowest priority; and,

"(7)  Compatibility of the proposed urban uses with nearby agricultural activities."

LCDC has characterized factors (1) and (2) as the "need factors" and factors (3) through (7) as the "locational factors." Local governments are required to use the "need" factors to estimate the amount of land that their urban areas will need for future growth. The "locational" factors are used to identify the lands most appropriate to accommodate that growth. *See* LCDC Continuance Order, Metropolitan Service District Acknowledgment Request, September 28, 1979, 6-7.

As a general rule, a local government is not permitted to establish an urban growth boundary containing more land than the locality "needs" for future growth. However, in certain limited circumstances, an urban growth boundary may contain extra land. When existing urban development or existing public facilities have "committed" an "unnecessary" piece of land to urban use, the local government may include that land in the boundary in order to avoid illogical development or service patterns. Metro Continuance Order, *supra,* at 12. To justify such a boundary, the local government must demonstrate, through the application of Goal 14's locational factors, that the land in question is in fact "committed" to urban use. Petitioner's attacks on the acknowledgment order all concern LCDC's approval of the city's determinations of "commitment." We turn now to those issues.

Assignments 2 through 4 contest the propriety of the placement of Area I within the UGB. This area lies at the northern tip of the designated urban growth area. The city points out that, in November, 1982, after LCDC had acknowledged the Salem plan, the Marion County Board of Commissioners signed an order incorporating the City of Keizer. The newly incorporated city includes all of Area I. Keizer's incorporation removed the contested property from the City of Salem's jurisdiction and rendered moot all issues surrounding its inclusion in the Salem UGB.

Assignments 5 through 8 are directed at LCDC's acceptance of the city's decision to include Areas VI and VIII in the southern portion of the UGB. The city's determination

that those areas are "committed to urbanization" was based mainly on the city council's recent decision to construct a sewer system in South Salem. 1000 Friends asserts that (1) LCDC's findings with respect to the sewer system are not supported by substantial evidence and (2) the findings do not support LCDC's conclusion that Areas VI and VIII are committed to urban use. We agree.

After LCDC's second review of the Salem plan, the Commission ordered the city to remove Areas VI and VIII from the boundary. After that, the Salem City Council approved the construction of the South Salem Sewer Relief System (SSSRS). When Salem resubmitted its plan to LCDC, without having removed Areas VI and VIII,[5] the city's Conformance Document[6] explained the retention of those lands in terms of the SSSRS. In other words, in the city's view the advent of the SSSRS "committed" the areas to urbanization:

> "The following discusses the locational factors relating to specific areas which were considered in the delineation of the urban growth boundary:
>
> "\* \* \* \* \*
>
> "Area VI
>
> "LCDC directed that portions of Area VI be removed from the UGB.[7] After reviewing the boundary in this area, approximately 200 acres were removed from the UGB. Primarily Class III and some Class II soils were removed from the boundary. The new boundary line follows property lines that more closely approximate the extent of one of the water service levels, eliminating an area that would have been difficult to serve. Area VI is all in one drainage basin, so sewer service can be extended without any problem. The South Salem Sewer Relief System will have adequate capacity to serve the land remaining in the UGB. Sewer and water service costs for Area VI, as redrawn, are relatively low.
>
> "\* \* \* \* \*
>
> "Area VIII

---

[5] The city did remove 200 acres of Area VI and 10 acres of Area VIII from the UGB.

[6] A Conformance Document is a device by which a submitting jurisdiction reviews, commonly on a goal-by-goal basis, the manner in which its proposed comprehensive plan complies with the land use goals.

[7] LCDC had actually required that all of Area VI be removed.

"LCDC directed that portions[8] of Area VIII be removed from the UGB. This area was reviewed for the removal of some acreage from the UGB in response to the directive from LCDC. At the time of previous submittal of the SACP in August 1980, South Salem was considered to be among the most expensive to serve. There was also a problem of the downstream sewers not having the capacity to handle flows from the South Salem area. This has since changed with the City Council's commitment to build the South Salem Sewer Relief System which will have the capacity to serve all the land within the UGB in the south. The relief system is currently in the design stages and will be under contract for construction by this summer. It is scheduled for completion by the end of 1982. A large part of Area VIII is included in the adopted Capitol Improvements Program.

"* * * * *"

Citing these portions of the city's Conformance Document, LCDC made the following findings of fact:

"* * * According to the revised Conformance Document, the primary reason for retaining the remainder of areas VI and VIII is the recent council commitment to build the South Salem Sewer Relief System. Scheduled for completion in 1982, *[1] the main trunk line of this system will traverse area VIII and area VI. [2] The system is intended to alleviate existing problems with 'downstream sewers not having the capacity to handle flows from the South Salem Area.' [3] In order to be economically feasible, the relief system was designed with the 'capacity to serve all the land within the UGB in the south,"* including the remaining portions of areas VI and VIII [Conformance Document, p. 69]. The conformance document finds that with the completion of the Relief System, sewer and water costs for the remainder of area VI and will be 'relatively low" [Conformance Document, p. 69].

"* * * * *

*"Objections:* "1000 Friends objects to inclusion of areas VI through VIII, since 'the City's contention that unneeded land must be placed within a UGB because a planned project will reduce the cost of serving it is ludicrous.' According to the objector, the planned sewer relief system which would serve these areas is not by itself sufficient cause for including them.

*"Response:* * * * The objection to areas VI through VIII is not valid. *The City has demonstrated that a peripheral South*

---

[8]Again, LCDC had ordered the removal of all of Area VIII.

*Salem Sewer Relief System will necessarily traverse these areas and therefore commit them to urban development."* (Emphasis supplied.)

1000 Friends asserts that the record lacks substantial evidence to support the emphasized findings. Because these are the findings that LCDC relied on to support its conclusion that Areas VI and VIII are "committed," 1000 Friends also urges that the Commission's findings fail to support its conclusion.

■    Two of LCDC's three key findings are completely without evidentiary support. The city's Conformance Document says nothing about the "necessity" of having the SSSRS traverse Areas VI and VIII and nothing about the economic viability of the system depending on its capacity to serve Areas VI and VIII. Assuming, without deciding, that the remaining fact is adequately supported by the Conformance Document,[9] that fact alone will not support a finding of commitment, because it does not directly address any of the Goal 14 locational factors. LCDC's findings of fact do not support its conclusion that the city's retention of Areas VI and VIII satisfies the requirements of Goal 14.

1000 Friends next challenges LCDC's approval of the city's retention of Area IX and land "in the vicinity of" Areas VII and VIII.[10]

After its second review of the Salem Plan, LCDC required the city to "remove portions of area * * * IX * * * and areas in the vicinity of areas VII [and] VIII * * * which cannot be justified on the basis of factor 3-7 of Goal 14." The Commission also stated that "[t]he geographic limits of these areas must be defined by more specific features in order to make them more identifiable." As far as we can tell, the city's revised comprehensive plan does not better define these areas, and the city has not removed any lands "in the vicinity of" Areas VII and VIII from the UGB. On its third review of the Salem plan,

---

[9] *See* discussion of Area IX, *infra,* at 248.

[10] Petitioner also contests the findings concerning lands "in the vicinity of" Area IX. Those lands are not in issue. Although LCDC discusses lands "in the vicinity of" Area IX in the findings that accompany its acknowledgment order, its previous continuance order did not direct the city to remove lands near Area IX from the UGB. Those lands do not appear ever to have been in issue, and we will not consider them for the first time on appeal.

LCDC did not deem those omissions to be goal violations. Instead, the Commission made a number of findings with respect to lands "in the vicinity of" Areas VII and VIII and approved their inclusion within the UGB.

1000 Friends first contends that LCDC's findings with respect to areas in the vicinity of Areas VII and VIII do not support findings of goal compliance. The findings are that (1) "[l]and in the vicinity of areas * * * VII [and] VIII, * * * which was previously unable to be economically serviced, will be servicable by the recently approved [SSSRS] and has therefore been retained in the boundary," (2) "streets are stubbed into [Area VII] which can be served with sewer and water at relatively low cost," and (3) "urban services are committed to areas around areas VII and VIII and * * * these facilities will lower service costs for the area * * *."

The first and third findings of fact are apparently based on the Conformance Document's discussion of the SSSRS in the context of Area VIII itself, quoted *supra*. The document does not separately discuss lands "in the vicinity" of Areas VII and VIII, and neither LCDC nor the city point to any other place in the record where such lands are mentioned.

LCDC's second finding, that streets are stubbed into Area VII, is a direct quote from the Conformance Document. Even if we assume that such a conclusory statement in the Conformance Document could constitute evidentiary support for LCDC's findings,[11] the fact that streets are stubbed into Area VII does not support a conclusion that land *in the vicinity* of Area VII is committed to urban development. There is therefore no evidentiary support for LCDC's findings with respect to lands "in the vicinity" of Areas VII and VIII.[12]

1000 Friends' assignment of error 10 states:

"LCDC's finding that the Salem Plan's justification for Area IX demonstrates that it is 'committed not only by service plans, but by existing facilities and development' is not supported by substantial evidence and does not support a finding of goal compliance."

---

[11] *See* discussion of Area IX, *infra,* at 248.

[12] On remand, we suggest that LCDC and the city, in addition to reconsidering the status of lands "in the vicinity of" Areas VII and VIII, make an effort to define the boundaries of those lands.

We read this as two separate contentions: (1) LCDC's Area IX findings are not supported by substantial evidence, and (2) LCDC's findings, even if they are supported by substantial evidence, do not support a finding of "commitment" under the locational factors. We agree with the first contention; there is therefore no need to consider the second.

LCDC adopted the city Conformance Document findings with respect to Area IX:

> "Area IX
>
> "This area was considered for removal from the UGB because it is among the more costly areas to serve, particularly with water. The three jurisdictions left this area in the UGB because of a strong belief that urban development should be directed to the south, away from the prime farm land to the north and northeast. This area contains primarily Class III soils, with some Class II, IV, and VI. The steep slopes in the area make much of the land unsuitable for farming. Area IX contains one of Salem's high schools. This being a major residential attractor it is expected to draw new residential development to the area. Leaving the area out of the boundary in a rural residential designation would have allowed the parcelization of the area which would make the future extension of urban services even more costly. The northern portion of the Croisan drainage base is already in the city limits, which obligates services to this area. The area in the city contains several water service levels which could be more economically served if the area to the south is included in the UGB."

LCDC and the city rebut the substantial evidence argument by stating only:

> "* * * [T]he city provided the following evidence to the agency to support a finding of 'urban commitment': a high school is in this area, which facility attracts residential development; the land in Area IX is too steep for farming with primarily Class III soils; a portion of Area IX is already in the city limits, and, if Area IX is included in the UGB, these in-city areas will be more economically served with water. These factors are all existing conditions upon which the agency could base its findings. * * *"

This "argument" is nothing more than a recitation of the facts stated by the city in its Conformance Document. Such a recitation, without citation to evidentiary support for

those findings in the record, does not demonstrate that substantial evidence exists for LCDC's findings. In other words, a *conclusion* of goal compliance must be based on *findings of fact* that are supported by *evidence* in the record. ORS 183.470 and 183.482(8)(c). Here, LCDC has drawn a conclusion of goal compliance from the facts in the Conformance Document, but neither LCDC nor the city has cited evidence to support those findings. Without LCDC's and the city's assistance in locating evidence that justifies the findings—if such evidence exists— we have no basis for a determination that the findings are supported by substantial evidence.[13] We then have to hold that the findings of fact are not supported by substantial evidence.[14]

1000 Friends next asserts that LCDC's findings for Area XIII "fail to satisfy Goal 14's locational factors." LCDC's discussion of Area XIII again adopts the facts set forth in the city's Conformance Document:

"[1] This area contains [the] Broadview Subdivision at the western fringe of the UGB. [2] Salem School District 24J and the Regional Parks and Recreation Agency have purchased property in this area for a secondary school and community park development. [3] [Part of the area is] in the adopted CIP [Capitol Improvement Plan] and [4] urban services planning for the entire area has taken place through the West Salem Sector Plan."

In addition, the Commission cites the West Salem Sector Plan as evidence of:

(1) "existing and committed development in areas XI-XIII;"

(2) "existing and proposed major street facilities, sanitary sewer facilities, water system facilities and park facilities;"

(3) "a new 'force main' to serve the entire West Salem area"; and

---

[13] We decline to conduct an independent search of the record for evidentiary support. Both LCDC and the city should be intimately familiar with the record, and we are not. When they are unwilling or unable to direct us to the documentary evidence upon which the findings are based, we will assume that none exists.

[14] Also, as noted, because the findings lack evidentiary support, we need not consider whether those findings support the commission's determination of goal compliance.

(4) "major expansion of the Center/Marion Street Bridges [that will be able] to provide adequate transportation service to the West Salem area."

■ Although these findings do not directly discuss the Goal 14 locational factors, they demonstrate consideration of those factors and justify a determination that the area is committed. First, they show that the city considered factor 3 concerns. The West Salem Sector Plan shows extensive planning of water systems, sewer systems and roads, supporting a conclusion that services can be provided to that area in an orderly, economical manner. The findings also illustrate the city's and LCDC's consideration of factor 4: as a general rule, it is efficient to extend urban development into areas where such development has already begun, some urban services already exist and additional services are planned. With respect to Area XIII, we cannot say as a matter of law that LCDC's determinations of commitment and goal compliance are wrong. We therefore uphold the Commission's assessment.[15]

Assignments 13 and 14 state that LCDC:

"* * * erred in concluding that the city's justification for Areas XI, XII and XIII 'demonstrate that these areas are committed not only by service plans but by existing facilities and development' " and

"erroneously based a finding on evidence admitted in violation of ORS 197.251(4)."

We have already considered the propriety of LCDC's action concerning Area XIII; there is no need to examine it further.[16] We therefore consider only the arguments raised with respect to Areas XI and XII.

■ One of LCDC's findings for Area XI was that the area

---

[15] Neither LCDC nor the city have discussed the characteristics of Area XIII with direct reference to the Goal 14 locational factors. In upholding the Commission's determination, we have made the obvious connections ourselves. In the future, however, the Commission and local governments will be able to demonstrate their consideration of the Goal 14 factors more clearly if they make explicit the relationship between land characteristics and the locational factors.

[16] We do not read 1000 Friends' argument as an attack on the evidentiary support for the contested finding as that finding relates to Area XIII. The specifics of the argument all concern the evidence about Areas XI and XII; we view the inclusion of Area XIII in the assignment as a result of LCDC's decision to group Areas XI-XIII together in that particular finding.

"* * * has an average parcel size of five to ten acres (personal communication, Anna Rousseau, May 20, 1982)."

1000 Friends points out that May 20, 1982, was the date of LCDC's hearing on the Salem Plan and that the "personal communication" was Rousseau's testimony before the Commission. It argues that that testimony was improperly received under the terms of ORS 197.251(4) and that the Commission therefore erred in relying on that evidence to support its decision. We agree.

ORS 197.251(4) provides:

"(4)  The commission's review of the acknowledgment request shall be confined to the record of proceedings before the local government, any comments, objections and exceptions filed under subsections (2) and (3) of this section and the report of the director. Upon its consideration of an acknowledgment request, the commission may entertain oral argument from the director and from persons who filed written comments, objections or exceptions. *However, the commission shall not allow additional evidence or testimony that could have been presented to the local government or to the director but was not.*" (Emphasis supplied.)

■    LCDC does not contend that the information about parcel size was presented to the city or to the director before the hearing. Instead, the Commission argues that 1000 Friends waived its objection to the evidence by not objecting at the hearing. We refuse to so hold. First, the purpose of ORS 197.251(4), which is to ensure that relevant evidence is placed before the local government and the Commission at the earliest possible stage in the planning process, would not be served by accepting LCDC's argument. Second, to interpret the statute in the manner the Commission suggests would require LCDC hearing participants to familiarize themselves in advance with the entire record before the agency, so that they could identify new information as soon as it was presented and object in a timely manner. The records in acknowledgment proceedings are sometimes voluminous; to place such a burden on participants would be unreasonably burdensome. Failure to object to Rousseau's testimony did not operate as a waiver of an objection to that evidence.[17]

---

[17] By our ruling we do not mean to foreclose LCDC from augmenting the record at the hearing on the stipulation of all parties to the acknowledgment proceeding. That process may be available, ORS 197.251(4) notwithstanding.

■     We must decide what effect LCDC's consideration of the improperly admitted evidence has on the outcome of the case. LCDC's order presents the information about parcel size as a finding in support of its determination of commitment. The order gives no indication of the weight LCDC attached to various findings, and we cannot tell whether, without that finding of fact, LCDC would still have concluded that Area XI is committed to urban uses. We must therefore remand the order to the Commission with the instruction that it redetermine the status of Area XI without considering the Rousseau testimony. *See Palen v. State Bd. Higher Education,* 18 Or App 442, 525 P2d 1047 (1974).

With respect to Area XII, 1000 Friends argues that LCDC erroneously relied on evidence of "existing and committed development" and "existing and proposed" public facilities.

LCDC made the following findings for Area XII:

"Urban services planning for West Salem has been underway since the adoption of the Growth Management Program in July, 1977. As a targeted growth area, much planning effort and financial commitment has gone into this area based on the existing boundary. The West Salem Sector Plan, which is a plan for urban services for this area has recently been adopted. Streets from Chatnicka Heights Subdivisions have been stubbed at the southern part of Area XII. (quoting from the Conformance Document.) [Sic]

"* * * * *

"* * * [T]he West Salem Sector Plan show[s] existing and committed development in areas XI-XIII. The plan also indicates existing and proposed major street facilities, sanitary sewer facilities, water system facilities and park facilities. The sector plan recommends a new 'force main' to Willow Lake Sewage Treatment Plant to serve the entire West Salem area * * *. The City states that they now have a financial commitment to construct this main, and that construction will begin around July, 1982. * * * The City has also undertaken major expansion of the Center/Marion Street Bridges to provide adequate transportation service to the West Salem area." (Emphasis supplied.)

1000 Friends points out that the West Salem Sector Plan maps do not show existing or committed development in Area XII. Because that plan is the only evidence cited to show

such development, petitioner's argument is, in effect, that the record does not support LCDC's finding of existing development in the area. That is correct.

As noted, the findings of fact state that there is "existing and committed development in Areas XI-XIII." While maps submitted with the comprehensive plan show existing development in Areas XI and XIII, they show no such development in Area XII. Likewise, there is nothing to indicate "committed" development in that area. Again, we cannot tell whether, without its finding of "existing and committed development," the Commission would have concluded that Area XII is committed to urban use. We must therefore remand the order for LCDC to redetermine the status of Area XII. *See Palen v. State Bd. Higher Eduction, supra.*

1000 Friends' final assignment asserts that LCDC "erred in concluding that a parcel of farmland north of Salemtowne is committed to urban development."[18]

LCDC's findings state:

"* * * The 30-acre property in question was proposed as Phase II of Salemtowne at the time that developement was initiated. Therefore, urban land services, including streets and sewer lines, abut the property and were designed to service the Phase II development. Furthermore, in anticipation of Phase II, units in Salemtowne were sited less than four feet from the adjacent property line, thus creating conflicts with some agricultural practices. The property was initially placed in the UGB in the 1973 plan and the City has demonstrated that topographic considerations, in particular the creek on the north property line, form a natural buffer defining the UGB and serving as a buffer from adjacent agricultural uses (Personal Communication, Paul Bunn, October 20, 1981). The property is therefore committed to urban level development. * * *"

Petitioner asserts that these findings are not supported by substantial evidence in the record. In support of its

---

[18] LCDC first found that the parcel was committed to urbanization in the findings accompanying its November, 1981, continuance order. On its third and final review of the plan, the Commission merely reaffirmed its earlier decision.

1000 Friends and the Salemtowne Civic Association both objected to the inclusion of this area during LCDC's second review of the Salem plan. Neither the city nor the Commission contend that the original objections were not timely. We therefore do not consider that issue.

argument, it cites a letter from the Salemtowne Civic Association which reports that (1) the land was not included in the UGB until 1979, (2) the streets that purportedly abut the property have never been dedicated to public use and have, in fact, been purchased for private residential development and (3), even though the land has been in agricultural use since at least 1975, neither the farmers nor the Salemtowne residents have observed any "incompatability" between the farming and residential uses.

■ Neither LCDC nor the city point to anything in the record that supports the Commission's findings. We are thus asked to decide whether the mere fact that LCDC had a "personal communication" from Paul Bunn, who gave LCDC the factual information included in its order, is "substantial evidence" to support the findings. We hold that it is not.

In *Cook v. Employment Division,* 47 Or App 437, 614 P2d 1193 (1980), we said that substantial evidence is

"* * * any reasonable evidence or such proof as a reasonable mind would employ to support a conclusion." 47 Or App at 441. (Citation omitted.)

It might have been permissible, in this case, for LCDC to have based findings on "personal communications" presented to it in the review process from individuals with knowledge about the issues before the Commission. However, we do not know anything about Paul Bunn except his name, and that is not enough for us to determine whether LCDC's reliance on his communication was permissible. We therefore cannot say that the Commission's findings were based on evidence that "a reasonable mind would employ to support a conclusion." The order must be remanded to LCDC for further clarification of the evidence upon which it relied.

In summary, we affirm LCDC's order with respect to all issues raised by FRG, and with respect to the Commission's determinations about Areas I and XIII. The record does not support the Commission's findings concerning Area IX, lands "in the vicinity of" Areas VII and VIII, and the 30 acre parcel north of Salemtowne. The Commission's findings do not support its conclusions of goal compliance for Areas VI and VIII. With respect to Areas XI and XII, certain findings lack evidentiary support, and we cannot say whether, without those

findings, LCDC would have found goal compliance. We therefore reverse and remand in part with instructions to LCDC to redetermine the status of Areas VI, VIII, IX, XI, and XII, lands "in the vicinity of" Areas VII and VIII, and the 30 acre parcel north of Salemtowne.

Affirmed in part; reversed and remanded in part.