# IN THE OREGON TAX COURT

## WILLIAMS
*v.*
## DEPARTMENT OF REVENUE
(TC 2573)

Wallace W. Lien, Attorney at Law, Salem, represented plaintiff.

Ted E. Barbera, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision part for plaintiff and part for defendant rendered on November 23, 1987.

**CARL N. BYERS, Judge.**

This case concerns the taxable value of a 5.5-acre tract of land as of January 1, 1985. Plaintiff appeals from defendant's Opinion and Order which found that the subject property did not qualify for special farm use assessment and should be valued, instead, as a residential building site.

The subject tract is located in Polk County in an area commonly known as West Salem. Although the property is outside the city limits of Salem, it is located within the urban growth boundary of the city. The property fronts 37th Avenue, the paving of which is largely now deteriorated, leaving the

street in poor condition. The subject property has access to electric power lines and telephone lines but is not served by water or sewer lines. The property is zoned suburban residential (SR) and has the potential for constituting a desirable home site.

The subject property was once half of a 10-acre tract of land which plaintiff and his sister inherited from their parents. Plaintiff and his sister had the 10-acre tract partitioned in April, 1981, at which time plaintiff became the sole owner of the subject 5 acres. The entire 10-acre tract, which was improved with a cherry orchard, was leased to Wayne Simmons, a local farmer, on a sharecrop basis beginning in 1975. Plaintiff continued to lease out the subject 5 acres for farming after the partition in 1981.

Mr. Simmons testified that, over the years, the cherry trees declined for reasons still unknown. Although Mr. Simmons checked the trees for disease and other problems, he was unable to ascertain why the cherry trees were in a state of decline. Mr. Simmons testified that he followed the normal practice of cherry orchardists in caring for the orchard, which included dormant sprays, fertilizer, prebloom sprays, discing, harvesting and pruning. During the good years, he harvested approximately 30 tons of cherries from the 10 acres per year. However, the decline and weather conditions combined to prevent any harvest after 1982. In 1983, the diminished cherry crop was not harvested because it was cracked due to rain. In 1984, due to the cold, there was a "poor set" of blossoms and no crop worth harvesting was realized. At that point, it became apparent to Mr. Simmons and plaintiff that the orchard was never going to "come back." Plaintiff adopted a wait and see attitude but advised Simmons not to spend any more money on the orchard. Simmons did not spray in the fall of 1984, or disc the orchard in the spring of 1985.

When no crop appeared for harvest in June of 1985, plaintiff had the trees removed. Simmons then decided to grow Christmas trees on the property and chisel-plowed it to remove roots and other impediments to planting trees. He testified that he also picked up sticks and rocks. However, the noble fir stock which he desired to plant was not available in 1986 and, as yet, the land is still bare.

The above facts give rise to three issues which need to be addressed in sequence. Those issues are:

(1) Did the property qualify for special farm use assessment as of January 1, 1985?

(2) Was the property "buildable" as of January 1, 1985?

(3) What was its true cash value as of January 1, 1985?

*Special Farm Use Assessment*

■ ■ Based on the evidence adduced by the parties, the court finds that the property was not "currently employed" as required by ORS 215.203 in order to qualify for special farm use assessment on January 1, 1985. Although plaintiff, through his lessee, did follow the normal agricultural practices for cherry orchards through the harvest period of 1984, that practice ceased after the harvest season. As of the date in question, the property was not being utilized by "accepted farming practice" to obtain a profit. The land was not just lying fallow within the meaning of the statute. *Monner v. Department of Revenue,* 3 OTR 523 (1969). The court recognizes that this is a strict construction of the statute but such is required where the statute constitutes a partial or full exemption from property tax. As indicated in *Shepherd v. Dept. of Rev.,* 8 OTR 122 (1979), the special farm use statute makes no provision for efforts directed at making the property profitable in the future but requires a current use intended to make a profit.

*Buildable Home Site*

Plaintiff contends that as of January 1, 1985, the subject property was subject to a septic tank "moratorium" imposed by the City of Salem. Consequently, with no sewer lines available, the property was unbuildable. Plaintiff introduced evidence to show that if the property could not be used as a residential home site, its value was limited to farm use.

Since the property is located outside the city limits but inside the city's urban growth boundary, substantial confusion has resulted from the mylar-like layers of government as to the requirements that must be met to obtain a septic tank permit. The State Department of Environmental Quality (DEQ) and the State Land Control Development Commission (LCDC) require certain coordination to achieve the legislative

goals. To that end, DEQ published a booklet entitled "Land Use Consistency Procedures For DEQ Actions." (Exhibit D.) That booklet, in part, addresses the procedures for processing land-use compatibility statements. In order to obtain a septic tank permit, the applicant must receive the approval of certain designated governmental bodies. For property such as the subject, which is located in the county but inside the city's urban growth boundary, the applicant must obtain the approval of either the city or the county or both, depending upon certain circumstances.

Plaintiff called as a witness Mr. Ken Battaille, Land Use Planning Director for the City of Salem. Mr. Battaille testified that as of January 1, 1985, the city had imposed a moratorium on the use of septic tanks for the subject property. Consequently, if plaintiff had attempted to obtain septic tank approval from the City of Salem he would not have received it as of January 1, 1985. Defendant counters this position on two points. First, defendant points out that where a lot was created prior to August 1, 1981, as the subject lot was, only the county was required to sign off on a compatibility statement. (Exhibit D, at A-2.) However, the booklet also indicates that if the city's comprehensive land use plan has been acknowledged by LCDC, then it requires either the city or the county's approval, as "locally agreed in the Urban Growth Management Agreement." Apparently, the city's comprehensive plan was acknowledged by LCDC on May 26, 1982.[1] (See footnote 2, Ex. A, at 34.) The record is not clear whether the city or the county had an Urban Growth Management Agreement in 1985. It is clear that the city did, and perhaps still does, maintain that individuals seeking a septic tank permit outside the city but within the urban growth boundary must be approved by the city. As evidenced by plaintiff's Exhibit 4, the city had a policy of not approving such applications.

Defendant contends however, that the city was in error in maintaining its position as evidenced by the decision in *Gary L. Hanley and Wallace Huecker v. City of Salem,* LUBA No. 85-056 (Exhibit A, at 31-34.) Whatever the real

---

[1] Although the acknowledgment by LCDC was appealed and subsequently reversed as to some areas, it does not appear that the subject property was in one of those areas. *See City of Salem v. Families For Responsible Gov't.,* 64 Or App 238, 668 P2d 395 (1983).

legal requirements were, which are still not clear from this record, the preponderance of the evidence is that the market believed that the city approval was necessary and would not be forthcoming. With such a profusion of conflict and confusion, it is highly unlikely that any knowledgeable buyer would voluntarily wade into the DEQ/LCDC legal swamp when there were alternative properties available. The court recognizes that oftentimes sale of a property may be made contingent upon the purchaser obtaining government approval. Here however, the evidence is that the government had a policy of not granting approvals. Accordingly, the court finds that the subject property was not "buildable" as of January 1, 1985.

*True Cash Value*

■ The remaining issue before the court is what was the true cash value of the subject property as of January 1, 1985? Having determined above that the property did not qualify for special farm use assessment and also did not qualify for a septic tank permit, the value to be found is that of a property with limited use. Plaintiff's appraisal witness gave alternative opinions as to the true cash value of the property, first as a residential building site and, second, as to its value if a septic tank permit could not be obtained. In the appraiser's view, if a septic tank permit could not be obtained, its use was limited to farming or agricultural purposes. Accordingly, his opinion is that its value would be the same as its farm use value.

Defendant's appraisal witness, believing that the property could be built on, offered an opinion of value only as a building site. In answer to a question on cross-examination, he did indicate that if the property could not be built on, he felt the value could be higher than farm use value because of others who might purchase the property to enlarge their own holdings or for future speculation. He agreed however, that if the property could be farmed only, its value was $2,995 or the same value as for farm use.

Based upon the evidence adduced by the parties, the court finds that the true cash value of the subject property as of January 1, 1985, was $2,995. This is the value of the property as bare land outside the city limits but inside the urban growth boundary for which no septic tank permit could be obtained. Judgment will be entered consistent with this opinion. Plaintiff to recover costs and disbursements.