Argued and submitted November 8, 1979,
reversed and remanded March 24, 1980

WILLAMETTE UNIVERSITY, et al,
*Petitioners,*

*v.*

LAND CONSERVATION AND DEVELOPMENT
COMMISSION, et al,
*Respondents,*
*and*
CITY OF EUGENE,
*Respondent - Cross-Petitioner.*

(No. 77-014, CA 12934)

608 P2d 1178

Vernon D. Gleaves, Eugene, argued the cause for petitioners. With him on the briefs were Michael E. Farthing, and Butler, Husk, Gleaves and Swearingen, Eugene.

Al J. Laue, Assistant Attorney General, Salem, argued the cause for respondent Land Conservation and Development Commission, an agency of the State of Oregon.

Robert E. Stacey, 1000 Friends of Oregon, Portland, argued the cause and filed the brief for respondents Phyllis Sidney Herbert and Barbara Y. Bowerman.

No appearance for respondents Jan I. Wostmann, William B. Muir, Gerald H. Rust, Tom Bowerman, George Arnis, Ardie Arnis, and Cynthia Wooten.

John B. Arnold, Eugene, argued the cause for respondent - cross-petitioner City of Eugene. With him on the brief were Stanton F. Long, Timothy J. Sercombe, and Johnson, Harrang & Mercer, Eugene.

Before Schwab, Chief Judge, and Richardson and Joseph,* Judges.

SCHWAB, C. J.

---

*Joseph, J., *vice* Lee, J., deceased.

## SCHWAB, C. J.

This is an appeal from an order of the Land Conservation and Development Commission that upheld in part and invalidated in part a rezoning ordinance of the City of Eugene. The principal issues involve questions of LCDC's jurisdiction, petitioners' standing and whether all land within a city's limits is, before acknowledgement of the city's comprehensive plan, per se "urbanizable" within the meaning of the statewide planning goals.

### I

Willamette University and others (hereinafter "intervenors") are the owners of the subject property which consists of about 390 acres. Intervenors applied to the City of Eugene (hereinafter "respondent") for annexation and rezoning of the subject property. Intervenors intended to develop the property with a mixture of industrial, commercial and residential uses.

After a public hearing, the Eugene Planning Commission recommended that both the requested annexation and rezoning be approved. After public hearings, the Eugene City Council recommended approval of intervenors' annexation application and forwarded that recommendation to the Lane County Local Government Boundary Commission. The City Council also approved intervenors' requested zone change, subject to approval of the annexation by the Boundary Commission. After a public hearing, the Boundary Commission approved the annexation on April 7, 1977, and the annexation was effected on that date.

The ordinance rezoning the property, Eugene Ordinance No. 17901, took effect at the time of annexation. The property in question had previously been zoned by Lane County as AGT (agricultural, grazing and timber) and RA (residential agricultural). Ordinance No. 17901 rezoned the property as follows: about 120 acres to M-1 PD (limited industrial); about 10 acres to C-1 PD (neighborhood commercial); and about 260 acres to R-1 PD (single family residential).

[357]

Phyllis Herbert and others (hereinafter "petitioners") filed a petition with the Land Conservation and Development Commission contending that Ordinance No. 17901 violated the statewide planning goals. As explained more fully in Part V, *infra,* LCDC limited its review of Ordinance No. 17901 to the question of whether the ordinance was consistent with the four criteria that Statewide Planning Goal 14 requires be considered before urbanizable land is converted to urban land. (The relevant definitions of these various terms are also set out in Part V, *infra.*) LCDC paraphrased those criteria in a single phrase: proven need. LCDC ruled that there was substantial evidence to support a finding of a proven need for land zoned for industrial use; it thus concluded that the portion of Ordinance No. 17901 rezoning about 120 acres to M-1 PD (limited industrial) complied with the statewide planning goals. LCDC ruled that there was no proven need for additional residential and commercial land in the City of Eugene and concluded that the balance of Ordinance No. 17901 rezoning the subject property to residential and commercial zones was contrary to Goal 14.

In this case, intervenors appeal from that portion of LCDC's final order that invalidated the residential and commercial rezoning. In *Herbert v. City of Eugene,* 45 Or App 336, 608 P2d 1189 (1980), petitioners appeal from that portion of LCDC's final order that upheld the industrial rezoning. These two appeals from the same order present substantially the same issues.[1] We will thus consider all issues raised in both appeals in this opinion.

## II

Respondent City of Eugene and intervenors first join in the argument that LCDC lacked jurisdiction to consider this matter because they claim former ORS

---

[1] All of the parties, petitioners, intervenors and respondent participated in a single proceeding before LCDC. Petitioners and intervenors filed separate appeals from LCDC's final order at the conclusion of that single proceeding.

197.300(1)(d) (repealed by Oregon Laws 1979, ch 772, § 26) did "not permit or allow private individuals to challenge, by petition to LCDC, quasi-judicial land use actions made by local governing bodies * * *." Since former ORS 197.300(1)(d) has been repealed and replaced by a new statutory scheme that clearly provides for LCDC jurisdiction in this kind of situation (*see* Oregon Laws 1979, ch 772, §§ 3-6), it would serve no useful purpose to attempt to dissect the former statute at great length.

Former ORS 197.300(1)(d) provided:

"In the manner provided in ORS 197.305 to 197.315, the commission [LCDC] shall review upon:
" * * * * *

"(d) Petition by any person or group of persons whose interests are substantially affected, a comprehensive plan provision or any zoning, subdivision or other ordinance or regulation alleged to be in violation state-wide planning goals * * *."

Subsections 1(a), 1(b) and 1(c) of the same former statute defined various land use decisions that were reviewable by LCDC on petition by various *governmental* entities. *See, e.g., Fish & Wildlife Dept. v. LCDC*, 288 Or 203, 603 P2d 1371 (1979). Respondent and intervenors rely on nuances in the wording of the different subsections in urging that former ORS 197.300(1)(d) be interpreted as permitting *private* parties to seek LCDC review of only legislative, as distinguished from quasi-judicial, land use decisions. This suggested interpretation would defeat LCDC jurisdiction in this case because the zone change here in question was quasi-judicial in nature. *See Neuberger v. City of Portland*, 288 Or 155, 603 P2d 771 (1979), *reh den*, 288 Or 585, 607 P2d 722 (1980); *Sunnyside Neighborhood v. Clackamas Co. Comm.*, 280 Or 3, 569 P2d 1063 (1977).

Under respondent's and intervenors' theory, a comprehensive plan provision that applied to an entire community, or zoning ordinance that applied to an

[359]

entire community or subdivision ordinance that applied to an entire community would have been reviewable by LCDC on petition of a private party under former ORS 197.300(1)(d) because it would have been legislative action; but changing the comprehensive plan designation for a specific piece of property, as in *Sunnyside,* or rezoning a specific piece of property, as in *Neuberger,* or approving or denying a specific subdivision application would not have been reviewable by LCDC on petition of a private party under former ORS 197.300(1)(d) because it would have been quasi-judicial action.

We find no basis in the former statutory scheme for making LCDC's review jurisdiction dependent upon the, at times elusive, legislative versus quasi-judicial distinction. Former ORS 197.300(1)(d) permitted LCDC review of "any zoning * * * ordinance * * * alleged to be in violation of state-wide planning goals * * *." Petitioners here seek review of a zoning ordinance on the ground that it conflicts with the statewide planning goals. As the hearing officer, whose decision on jurisdiction was adopted by LCDC, stated: "It boggles the mind to argue that an amendment to a zoning ordinance is not a zoning ordinance." LCDC properly assumed jurisdiction. *Cf. Petersen v. Klamath Falls,* 279 Or 249, 566 P2d 1193 (1977).

### III

Respondent and intervenors contend there is no evidence in the record that petitioners had standing to bring this challenge to respondent's zoning ordinance. Respondent and intervenors are technically correct, but we find no reversible error.

The term "standing" was used in two different senses throughout the proceedings before LCDC. In one sense, "standing" was used as an abbreviation for the *legal* issue of whether *any* private party could seek LCDC review of a quasi-judicial zoning decision. *See* Part II, *supra.* In another sense, "standing" was used

to refer to the *factual* issue of whether *these* petitioners were "persons whose interests are substantially affected" within the meaning of former ORS 197.300(1)(d).

In paragraph III of their petition for LCDC review, petitioners alleged that they owned property in proximity to the rezoned parcel and that they were adversely affected by the rezoning in a variety of ways, *i.e.,* an allegation of *factual* standing. Respondent and intervenors first filed motions to dismiss on the ground, among others, that private parties could not seek LCDC review of any quasi-judicial zoning decision, *i.e.,* raising "standing" in the legal sense. In recommending denial of respondent's and intervenors' motions to dismiss, on September 20, 1977, LCDC's hearing officer concluded: "Petitioners have standing to bring this Petition for review." In context, it is obvious to us that the hearing officer used "standing" in the above-described legal sense, that being the only "standing" issue then before the hearing officer.

At its October 7, 1977, meeting LCDC adopted the recommendations of its hearing officer and found it had jurisdiction. This was memorialized in an LCDC order on October 13. Also on October 13 respondent filed an answer to the petition for LCDC review which alleged in part:

> "Respondent lacks sufficient information to form a belief as to the truth or falsity of the allegations of paragraph III [*i.e.,* petitioners' allegations of standing in the factual sense] and therefore denies [paragraph III]."

On October 14 intervenors filed an answer to the petition for LCDC review which alleged in part:

> "Intervenors * * * [d]eny the allegations contained in Paragraphs II, III [*i.e.,* petitioners' allegations of standing in the factual sense] and V of the Petition * * *."

At this point, petitioners had alleged they were "persons whose interests are substantially affected," for-

mer ORS 197.300(1)(d), and respondent and intervenors had denied those allegations.

It was slightly more than a year between respondent and intervenors filing their answers in October, 1977, and LCDC rendering its final decision in October, 1978. During that year respondent and intervenors repeatedly complained that petitioners had yet to come forward with any evidence in support of their allegation that their interests were substantially affected.

Petitioners requested an evidentiary hearing on the standing issue on November 4, 1977, and renewed that request on January 12, 1978, stating on the latter occasion:

"Petitioners submit that this issue [*i.e.,* standing] is one that could easily be resolved and could have been settled long ago by holding a factual hearing. For it to remain open needlessly complicates an already complex proceeding and prejudices Petitioners' interests."

LCDC's hearing officer concluded that no evidentiary hearing on petitioners' standing was warranted:

"* * * In this case the petition alleges not only residency or land ownership, but also alleges that one of the petitioners 'owns and farms lands lying within Lane County immediately adjacent to the City of Eugene and within less than 200 yeards of lands which are the subject of the city zoning action' and that another petitioner 'owns and farms lands lying within Lane County situated within sight and sound of the lands that are the subject of the city zoning action'. It further states that:

" 'all petitioners will be and are adversely affected by the zoning action of the City of Eugene that allocates and tends to bring about non-farm and urban use for the lands being zoned, lands which contain Class I to IV soils, such zoning being carried out without complying with the applicable portions of LCDC Goals 14, 3 and 2. Such improper conversion of lands reduces the inventory of prime farm land, causes an unnecessary

[362]

and avoidable inflation of the value of those petitioners' lands located in the area of the land being zoned, adversely affects farm management of adjoining farm areas by bringing about the location of buildings and uses within such farm areas which are incompatible with farm operations and risks the agricultural use and productivity of land suitable for agricultural pursuits. Several of the Petitioners either live or own land, or both, within sight and sound of property that is the subject of the City zoning action in question.'

" * * * * *

"Since the petition did contain factual statements signed by the Petitioners, I do not believe that a general denial is sufficient to require presentation of proof. Respondents have not challenged the ownership of property by these Petitioners. They have not challenged proximity to the property; they have not challenged that at least one or two of the Petitioners farm land within close proximity to the land. In short, they have not challenged anything which could be determined by a factual hearing such as contemplated by *Duddles* [*Duddles v. City Council of West Linn*, 21 Or App 310, 535 P2d 583 (1975)].

" * * * * *

"As a general policy rule, I believe that these hearings should be held only when a motion to dismiss or an answer which is filed calls into question factual issues such as location of Petitioner's property, or some similar specific evidentiary fact which could be determined by means of affidavits or a hearing. Nothing of this kind is involved in this case."

The ultimate LCDC disposition on the merits, made by an order adopted in October, 1978, said nothing about the issue of standing in the factual sense.

Respondent and intervenors could have challenged LCDC's final decision on the ground that it failed to deal with standing in the factual sense. Respondent and intervenors could have challenged the analysis of LCDC's hearing officer to the effect that a general

[363]

denial is insufficient to warrant an evidentiary hearing on standing. Respondent and intervenors did neither.

Instead, intervenors argue: " * * * there is no evidence in the record to support LCDC's conclusion of law * * * adopted by LCDC in the [October, 1977] Order Finding Jurisdiction * * * that '[P]etitioners have standing to bring this Petition for review.' " Intervenors' mistake is that the order they refer to—LCDC's October, 1977, order—found standing in the *legal* sense of entitlement of a private party to challenge a quasi-judicial zoning action. *See* Part II, *supra.* Their argument about standing in the factual sense—which was raised as an issue *after* the order they refer to—has nothing to do with what they assign as error.

Respondent comes closer, but also misses the mark. Respondent contends:

> "LCDC erred in adopting its Order Finding Jurisdiction, dated October 13, 1977, and its Final Order dated October 30, 1978, wherein LCDC found that Petitioners had standing to challenge City of Eugene Ordinance No. 17901. There is no substantial evidence in the record to support such a finding."

LCDC's October 13, 1977, order, to repeat, found "standing" in the *legal* sense; obviously, such a conclusion need not be supported by "substantial evidence." LCDC's October 30, 1978, order, also to repeat, did not find that petitioners had standing in the factual sense; it ignored the issue of factual standing.

While there may be legitimate questions about the treatment of the factual standing issue by LCDC and its hearing officer, none of those questions is properly raised by respondent's or intervenors' assignments of error made in this court. We thus find no reversible error.

## IV

Intervenors contend LCDC erred in invalidating respondent's zoning action because, they allege, it was

consistent with respondent's comprehensive plan. Certainly, a local land use decision must comply with the local comprehensive plan. *Baker v. City of Milwaukie*, 271 Or 500, 533 P2d 772 (1975). But intervenors seem to not appreciate that *in addition* a local land use decision must comply with the statewide planning goals unless and until the local comprehensive plan is acknowledged by LCDC to be in compliance with the statewide planning goals. *Sunnyside Neighborhood v. Clackamas Co. Comm., supra; Jurgenson v. Union County Court*, 42 Or App 505, 600 P2d 1241 (1979).

The acknowledgement issue is complicated in this case. The minutes of the February 1, 1977, LCDC meeting report that "a motion to acknowledge compliance [with the statewide planning goals] for the City of Eugene [comprehensive plan] *within the city limits* * * * carried unanimously." (Emphasis added.) We assume that this motion was subsequently embodied in a more formal LCDC order, but find no such order in the present record. The property rezoned by the ordinance challenged in the present proceeding was subsequently annexed to the City of Eugene over two months later, in April, 1977.

The February 1 motion to acknowledge Eugene's comprehensive plan "within the city limits" could have meant either: (1) within the city limits as they existed on that date; or (2) within the city limits as expanded by subsequent annexation activity. Intervenors at times seem to rely on the latter possible interpretation. LCDC, on the other hand, made a specific finding in this proceeding that: "The land subject to the [rezoning] ordinance was not within the boundaries of the city for which compliance had been acknowledged [in February, 1977]." Given that we have only LCDC's February minutes, as distinguished from a subsequent formal order, we find no basis in the present record for disagreeing with LCDC's finding.

It follows that intervenors' contention that the rezoning action complied with the comprehensive plan,

[365]

even if true, proves nothing for present purposes. The applicable comprehensive plan, as it applied to the subject property, had not been acknowledged by LCDC to be in compliance with the statewide planning goals. Therefore, compliance with the goals is a distinct, cognizable issue in this proceeding. *Sunnyside Neighborhood v. Clackamas Co. Comm., supra; Jurgenson v. Union County Court, supra.*

## V

The rest of the numerous issues presented all depend upon a single kingpin issue: whether the subject property was rural or urbanizable or urban within the meaning of the statewide planning goals.

### A. The Goals.

"Rural," "urbanizable" and "urban" are terms of art in the goals. (The goals and definitions are at OAR 660-15-000 to 660-15-010.) Those terms are particularly relevant to Goal 3 (relating to protection of agricultural land) and Goal 14 (relating to establishment or urban growth boundaries).

Goal 3 provides in part:

"* * * Conversion of *rural* agricultural land to *urbanizable* land shall be based upon consideration of the following factors: (1) environmental, energy, social and economic consequences; (2) demonstrated need consistent with LCDC goals; (3) unavailability of an alternative suitable location for the requested use; (4) compatability of the proposed use with use; (4) compatability of the proposed use with related agricultural land; and (5) the retention of Class I, II, III and IV soils in farm use * * *." (Emphasis supplied.)

Goal 14 provides in part: "Urban growth boundaries shall be established to identify and separate *urbanizable* land from *rural* land." (Emphasis supplied.) Goal 14 requires that establishment of urban growth boundaries separating urbanizable land from rural land be based on the following seven "factors":

"(1) Demonstrated need to accommodate long-range urban population growth requirements consistent with LCDC goals;

[366]

"(2) Need for housing, employment opportunities and livability;

"(3) Orderly and economic provision for public facilities;

"(4) Maximum efficiency of land uses within and on the fringe of the existing urban area;

"(5) Environmental, energy, economic and social consequences;

"(6) Retention of agricultural land as defined, with class 1 being the highest priority for retention and class 6 the lowest priority; and

"(7) Compatibility of the proposed urban uses with nearby agricultural activities."

Finally, Goal 14 establishes four standards for the conversion of urbanizable land to urban land:

"Land within the boundaries separating *urbanizable* land from *rural* land shall be considered available over time for urban uses. Conversion of urbanizable land to urban uses shall be based on consideration of:

"(1) Orderly, economic provision for public facilities and services;

"(2) Availability of sufficient land for the various uses to insure choices in the market place;

"(3) LCDC goals; and,

"(4) Encouragement of development within urban areas before conversion of urbanizable areas." (Emphasis supplied.)

Thus, determination of whether a given area is rural or urbanizable or urban determines the applicable conversion criteria. A proposal to convert rural land to urbanizable or urban land might have to satisfy the five-part test of Goal 3 and the seven-part test of Goal 14, although there is obviously some overlap between the standards of Goal 3 and the standards of Goal 14. A proposal to convert urbanizable land to urban land might have to satisfy the four-part test of Goal 14. Development of land that is already urban is apparently not subject to any of the limitations in Statewide Planning Goals 3 and 14.

## B. The Definitions.

The definitions of the critical terms in the statewide planning goals are not entirely clear.

"URBAN LAND: Urban areas are those places which must have an incorporated city. Such area may include lands adjacent to and outside the incorporated city and may also:

"(a) Have concentrations of persons who generally reside and work in the area

"(b) Have supporting public facilities and services."

"URBANIZABLE LAND: Urbanizable lands are those lands within the urban growth boundary and which are identified and

"(a) Determined to be necessary and suitable for future urban uses

"(b) Can be served by urban services and facilities

"(c) Are needed for the expansion of an urban area."

"RURAL LAND: Rural lands are those which are outside the urban growth boundary and are:

"(a) Non-urban agricultural, forest or open space lands or,

"(b) Other lands suitable for sparse settlement, small farms or acreage homesites with no or hardly any public services, and which are not suitable, necessary or intended for urban use."

We interpret the urban land definition to mean that urban land can exist only where there is an incorporated city, and it may include surrounding contiguous land outside the city limits that has urban population density and supporting urban services. However, all land within an incorporated city is not, expressly by definition, deemed urban.

Similar uncertainty applies to the definition of rural land. Once LCDC has acknowledged a city's urban growth boundary as being in compliance with the statewide planning goals, by definition there is no rural land within the boundary. But before acknowledgement, the definition of rural land sheds little

[368]

light on whether there can be rural land within an unacknowledged urban growth boundary or within city limits.

The definition of urbanizable land is the most problematic. While Goal 14 provides that all land within an acknowledged urban growth boundary is either urban or urbanizable, the definition of the term urbanizable land appears to impose three additional conditions before land is be regarded as urbanizable. Yet these three elements of the definition of urbanizable land are essentially the same as some of the seven factors listed in Goal 14 for consideration in establishing an urban growth boundary in the first place.

On balance, we are only able to conclude that urban and urbanizable lands lie within an acknowledged urban growth boundary while rural lands lie outside an acknowledged urban growth boundary.

## C. The Problem.

The above definitions make the most sense *after* a city's comprehensive plan, including an urban growth boundary, has been acknowledged by LCDC to comply with the statewide planning goals; they do not provide clear guidance for pre-acknowledgement application of the goals.

When the legislature first enacted the state land use planning program in 1973, it anticipated that all local governments would adopt comprehensive plans that complied with the statewide goals "within one year from the date such goals are approved by the commission [LCDC]." ORS 197.250. LCDC adopted the goals on January 1, 1975, making the contemplated deadline for local government compliance January 1, 1976. The legislative expectation that local governments would have their plans acknowledged by that date appears, from today's perspective, to have been idealistic.

The draftsmen of the statewide goals probably shared the expectation that local governments could

comply within one year. The goals are reasonably specific as far as telling a local government how to prepare a comprehensive plan that complies with the goals. But for present purposes—using the goals themselves as the controlling standard for pre-acknowledgement land use decisions—it would appear that the draftsmen of the goals simply did not anticipate the duration of the problem.

## D. LCDC's Regulation.

Possibly in response to the unanticipated delay in the local implementation of the state land use planning program, while the petition for review in this case was pending before LCDC, the Commission adopted regulations that proved relevant to LCDC's disposition of the petition. OAR 660-01-300 to 660-01-315. The critical rule for present purposes is OAR 660-01-305:

> "Lands within lawfully established city boundaries shall be considered to be urban or urbanizable land, as defined in the [statewide planning goals]. The requirements of * * * Goal # 14 * * * regarding conversion of agricultural or rural lands to urbanizable lands do not apply within city boundaries."

Petitioners had initially contended that the property rezoned by Ordinance No. 17901 was rural agricultural land and that the rezoning ordinance was inconsistent with Goal 3. OAR 660-01-305 is contrary to that contention. Based on OAR 660-01-305 LCDC adopted the following conclusion of law: "At the time of the adoption of the ordinance in dispute in this proceeding, the land to be rezoned by the ordinance was urbanizable land." The effect of that conclusion was to render irrelevant and inapplicable the five-part test of Goal 3 and the seven-part test of Goal 14, both of which govern conversion of *rural* to *urbanizable* land. *See* Part A, *supra.* Instead, LCDC reviewed Ordinance No. 17901 solely on the basis of the four-part test of Goal 14 which governs conversion of *urbanizable* to *urban* land, *i.e.*, proven need for the urban uses. As previously stated, Part I, *supra,* LCDC found that

[370]

the industrial zoning portion of Ordinance No. 17901 survived that limited review, and that the commercial and residential zoning portions of the ordinance did not survive that limited review.

### E. The Parties' Contentions.

Petitioners attack LCDC's conclusion of law that the subject property was urbanizable and the underlying rule on which that conclusion was based, OAR 660-01-305, as inconsistent with the statewide planning goals. According to petitioners, land is per se urbanizable under the statewide planning goals if and only if it is within an urban growth boundary that has been acknowledged by LCDC to comply with the statewide planning goals. Unless and until such acknowledgement, petitioners continue, whether any land is rural, urbanizable or urban must be determined on a case-by-case basis. Such a factual analysis in this case, petitioners conclude, would lead to the conclusion that the subject property is rural land.

Intervenors and respondent, on the other hand, argue the subject property is urban land; indeed, they assert that all land within a city is necessarily urban within the meaning of the statewide planning goals. They therefore disagree with LCDC's characterization of the subject property as urbanizable, although the basis of their disagreement is not clear. The essence of intervenors' position seems to be "the property was urban by reason of its annexation to the City of Eugene," but the only support intervenors offer for this contention seems to be the number of times they repeat it. Respondent seems to likewise be contending that the property became urban by definition upon its annexation.

It would seem that the only possible basis for saying all land within city limits is by definition urban would be the definition of urban land in the statewide planning goals. However, we have already concluded, Part B, *supra*, that definition does not so provide.

[371]

Neither the exact basis of the Boundary Commission's order approving the annexation nor the extent to which the statewide planning goals were considered at that time is clear. This is understandable, given that the Boundary Commission's decision preceded the Supreme Court's decision in *Petersen v. Klamath Falls, supra*; and LCDC's adoption of OAR 660-01-315—both of which clarified the standards applicable to pre-acknowledgement annexations.

The Boundary Commission's order first stated that the subject property was urbanizable because it was included in Eugene's urban growth boundary (which Eugene calls an urban service area). As pointed out above, in Part IV, however, unless and until Eugene's urban growth boundary is acknowledged by LCDC, the Boundary Commission's analysis is incorrect.

The Boundary Commission's order alternatively stated that a Goal 2, Part 2 exception to Goal 3 was justified because the subject property was irrevocably committed to nonfarm use by virtue of its inclusion in Eugene's urban service area. This is also incorrect; unless and until LCDC acknowledges a city's urban growth boundary, the city's act of including land within what it believes to be a proper urban growth boundary does not constitute a commitment of that land to nonfarm use.

### F. Analysis.

For purposes of pre-acknowledgement application, the definitions of urban, urbanizable and rural land are inconclusive on the question of whether all land within city limits has been defined as being in one of the three categories. Indeed, were the definitions in the goals conclusive, there would have been no occasion for LCDC to adopt OAR 660-01-305. *See*, Part D, *supra*.

We therefore turn to the purposes of Goals 3 and 14 for guidance as to whether all lands within the boundaries of an incorporated city are to be considered urban

or urbanizable as distinguished from rural. The purpose of Goal 3 is clear: to preserve and maintain agricultural lands for farm use. Conversion of agricultural land to urbanizable land is to be based on the factors listed in Goals 3 and 14. None of those factors suggests that the corporate boundary of the city has any effect on the application of Goal 3. The seven conversion factors in Goal 14 which are to be considered in the establishment or modification of urban growth boundaries, *see, Part A, supra,* do not attach any significance to the corporate limits of the city, either directly or by fair implication. The basic purpose of Goal 14 is also clear: The determination of which lands are to be made available for urban development is to be based upon objective planning criteria such as need for urban expansion, availability of urban services, efficiency of land use, and preservation of agricultural land for farm use. City limits are not necessarily drawn according to such criteria; the corporate boundaries of most cities were established before the statewide goals became effective and may include more land than is needed for urban expansion in the foreseeable future.

In adopting OAR 660-01-305 relating to lands within city limits, LCDC treated city boundaries as *de facto* urban growth boundaries, at least for purposes of Goal 3; that is, in the absence of an acknowledged urban growth boundary, LCDC reasoned that city limits serve to delineate an area within which Goal 3 does not apply. However, it is contrary to the purposes of Goals 3 and 14 to base the extent and timing of urban development on city boundaries that are not themselves based on the statewide planning goals.

LCDC, rather than this court, is the primary policymaker in this field. *Norvell v. Portland Area LGBC,* 43 Or App 849, 604 P2d 896 (1979). LCDC thus is entitled to amend the statewide planning goals to embody the policy choice stated in OAR 660-01-305.

[373]

But as matters now stand, we find that OAR 660-01-305 is inconsistent with Goals 3 and 14.

Ordinarily, a conflict in an agency's regulations would raise the possibility that the latter is an implied repeal or amendment of the former. That possibility does not arise in this context. The legislature has delegated separate responsibilities to LCDC: first, and more specifically, to adopt the statewide planning goals, ORS 197.040(2)(a), 197.225; second and more generally, to "promulgate rules," ORS 197.040(1)(b). In this statutory scheme, the goals occupy a preferred position. There are, for example, special procedures required, over and above the general rulemaking procedures of the Administrative Procedures Act, for LCDC's adoption or revision of the statewide planning goals. ORS 197.235 to 197.245. From this scheme, we conclude the legislature did not intend that the statewide planning goals could be indirectly repealed or amended by any exercise by LCDC of its general rulemaking power.[2]

LCDC decided this case on the basis of OAR 660-01-305. We hold OAR 660-01-305 is invalid. We remand to LCDC for a decision based on proper standards.

Reversed and remanded.

---

[2] LCDC has acknowledged the comprehensive plan and urban growth boundary of the City of Dundee—an urban growth boundary that is *smaller* than the Dundee city limits. That action produced a situation under the statewide planning goals where there is *rural* land, *i.e.*, land outside an acknowledged urban growth boundary, that is inside the corporate boundary of a city. That action appears inconsistent with the essence of OAR 660-01-305, *i.e.*, that all land within a city is urban or urbanizable.