On respondents - cross-petitioners' reconsideration filed April 20; on Land Conservation and Development Commission's reconsideration filed April 20; reconsideration allowed; former opinion filed March 21 (67 Or App 418, 679 P2d 320) withdrawn; affirmed as modified June 27, reconsideration denied September 7, petition for review allowed October 9, 1984 (298 Or 68)
See 299 Or 344, 703 P2d 207 (1985)

## 1000 FRIENDS OF OREGON et al,
*Respondents - Cross-Petitioners,*

*v.*

## WASCO COUNTY COURT,
*Respondent - Cross-Respondent,*

### KNAPP et al,
*Petitioners - Cross-Respondents.*

(81-132; CA A29802)

686 P2d 375

Robert E. Stacey, Jr., and Mark J. Greenfield, Portland, for respondents - cross-petitioners.

Dave Frohnmayer, Attorney General, William F. Gary, Deputy Attorney General, James E. Mountain, Jr., Solicitor General, Michael B. Huston, Assistant Attorney General, and Jeff Bennett, Assistant Attorney General, Salem, for Land Conservation and Development Commission.

Allen L. Johnson and Johnson & Kloos, Eugene, for petitioners - cross-respondents.

GILLETTE, J.

Richardson, J., dissenting.

## GILLETTE, J.

■     Petitioners Land Conservation and Development Commission (LCDC) and 1000 Friends of Oregon (1000 Friends) petition for Supreme Court review of our decision in *1000 Friends of Oregon v. Wasco County Court,* 67 Or App 418, 679 P2d 320 (1984) (hereafter *Wasco County II*), in which we reversed and remanded for reconsideration an order of the Land Use Board of Appeals (LUBA). The LUBA order held, *inter alia,* that the decision of respondent Wasco County Court (County) to approve a petition to incorporate the City of Rajneeshpuram was unlawful in substance because no Goal 2, Part II exception to Statewide Planning Goal 14, OAR 660-15-000(14), had been taken as required by LCDC goals and LCDC rule. We reversed, holding that LUBA erroneously interpreted[1] Goal 14 to preclude incorporation of rural land outside an established urban growth boundary. Treating the petitions as seeking reconsideration, ORAP 10.10, we grant the petitions, withdraw our former opinion and affirm LUBA's order.[2]

The pertinent facts are set out in our former opinion and will not be repeated here. This case presented an interpretive issue of first impression for LCDC (and for this court)—how do the Statewide Planning Goals, and particularly Goal 14, apply to the incorporation of a city?

In this case, LCDC adopted an interpretation of Goal 14 that it considered a logical extension of, if not identical to, the agency's prior interpretations in other contexts. The interpretation also serves the clear purpose of the goal and is supported by the goal's language. We nonetheless rejected LCDC's interpretation of Goal 14 and developed our own. LCDC's petition states:

> "The Court of Appeals' interpretation may well be an alternative reading of the goal's language. At the same time,

---

[1] As noted in our former opinion, LUBA's order incorporates LCDC's modifications of the LUBA proposed disposition of issues involving the statewide planning goals. 67 Or App at 423 n 5. *See also* Or Laws 1979, ch 772, §§ 5(1) and (3), and 6, *repealed by* Or Laws 1983, ch 827, § 59.

[2] In preparing this opinion, we have borrowed wholesale from the excellent petition filed on behalf of LCDC. As the Supreme Court has said in another context, "If we could say it better, we would do so." *State v. Lakeside,* 277 Or 569, 588, 561 P2d 612 (1977), *aff'd sub nom Lakeside v. Oregon,* 435 US 333, 98 S Ct 1091, 55 L Ed 2d 319 (1978).

however, it undermines the purpose of the goal and contradicts prior judicial and agency interpretation."

We agree.

We first consider LCDC's claim for the applicability of Goal 14 as that agency has interpreted it, which can be summarized in a relatively simple four-step analysis:

*Step 1:* The effect of an incorporation is to make available for urbanization land that otherwise would have to be rural.

Step 1 is derived from the language and intent of Goal 14 and the related goal definitions of urban, urbanizable and rural land. The basic aim of Goal 14 is "to provide for an orderly and efficient transition from rural to urban land use." Under the definitions, the existence of a city is a prerequisite for "urban land." Thus, in the absence of a city, there can be no urban land. Where there is no urban land, there can be no urbanizable land "needed for the expansion of an urban area." Therefore, under Goal 14, there cannot be an urban growth boundary "to identify and separate urbanizable land from rural land" in the absence of an incorporated city. Thus, the effect of incorporation is to make *available for* urban uses land that otherwise Goal 14 would require to be rural land. This court recognized as much in *1000 Friends of Oregon v. Wasco County Court,* 62 Or App 75, 81-82, 659 P2d 1001, *rev den* 295 Or 259 (1983) (hereafter referred to as *Wasco County I*),[3] when we stated:

"Implementation of the county's decision is the election to incorporate, to set urban boundaries and to effect a transition from rural to urban land use. *See* OAR 660-15-000 (Statewide Goal 14). It will have a significant impact if * * *, the voters elect to incorporate: *land that could not before have been used for urban use would be available for future urban use.*" (Emphasis supplied; footnote omitted).

*Step 2:* Goal 14 prohibits urbanization of land outside urban growth boundaries.

---

[3] We assume that the present opinion will be known to posterity as *Wasco County III.* If nothing else, the protracted litigation over the incorporation of Rajneeshpuram is justifying our childhood study of Roman numerals.

Step 2 is supported by the language and clear purpose of Goal 14. It also reflects the holdings of at least four LCDC or LUBA decisions and one opinion of this court.

The purpose of Goal 14 is "to provide for an orderly and efficient transition from rural to urban land use." Toward this end, Goal 14 requires that urban growth boundaries be established "to identify and separate urbanizable land from rural land." Implicit in this purpose and requirement is a prohibition against allowing rural land to be urbanized outside a UGB. If such a prohibition did not exist, the language and basic purpose of Goal 14 would be totally undermined. That is the interpretation previously utilized by LCDC and LUBA. *Ashland v. Jackson County,* 2 Or LUBA 378 (1981); *Conarow v. Coos County,* 2 Or LUBA 190 (1981); *Wright v. Marion County Board of Commissioners,* 1 Or LUBA 164 (1980); *Sandy v. Clackamas County,* 3 LCDC 139 (1979). This court also accepted that interpretation of Goal 14, albeit with little discussion, in *Carmel Estates Inc. v. LCDC,* 66 Or App 113, 672 P2d 1245 (1983). In that case, LCDC concluded that the county's zoning of land outside an urban growth boundary for urban-level commercial development violated Goal 14's prohibition. We expressly affirmed that holding. 66 Or App at 117 n 2.

*Step 3:* Therefore, Goal 14 prohibits incorporation of a city on land outside an urban growth boundary.

The effect of incorporation is to make land available for urbanization (Step 1). Urbanization of land outside urban growth boundaries is prohibited by Goal 14 (Step 2). If Steps 1 and 2 are accepted, it necessarily follows, as a matter of simple logic, that Goal 14 prohibits incorporation outside an urban growth boundary. (Step 3).

*Step 4:* Because Goal 14 prohibits incorporation of a city on land outside an urban growth boundary, an exception to the goal must be taken to allow such an incorporation.

Step 4 is consistent with, if not compelled by, the language of the goal and also follows logically from the first three steps. Under *former* Goal 2, Part II (*amended* December 30, 1983), an exception is required when "it appears that it is

not possible to apply the appropriate goal to specific properties or situations."[4] If the first three steps of the above analysis are correct, then it is not possible to apply Goal 14 when a city is incorporated outside an urban growth boundary, and an exception must be taken.

In our former opinion, we recognized LCDC's theory, but rejected it. Instead, we took the view—"a dramatically different" one, according to LCDC—that Goal 14 controls the conversion of rural land to urban uses only through the specific process of establishing an urban growth boundary. *1000 Friends of Oregon v. Wasco County Court, supra,* 67 Or App at 432. Our conclusion was based on the fundamental assumption that "urbanization of rural land is [not] the inevitable consequence of incorporation," because Goal 14's requirements for a UGB control such conversion. 67 Or App at 427. Without that assumption, it would have been impossible for us to conclude, as we did, that incorporation does not violate the urbanization and conversion provisions of the goal. 67 Or App at 432. With specific reference to the four-step analysis described above, our assumption is a rejection only of Step 1—that incorporation makes available for urbanization land that otherwise would be rural.

On reconsideration, we now conclude that our assumption is erroneous and represents a misstatement of Goal 14's UGB establishment process. The goal's seven factors for establishing a UGB are intended to determine *how much* land and *which* land may be included in a UGB. They do not, however, address the threshold question of *whether any land* should be converted to urban uses.[5]

---

[4] The 1983 legislature statutorily revised the exceptions process. Or Laws 1983, ch 827, § 19a (*codified as* ORS 197.732). Although that legislation revised the standards for an exception, it did not alter the basic purpose of the exceptions process.

[5] LCDC notes in a footnote to its petition:

"With the benefit of hindsight, LCDC now realizes that it should have offered the Court of Appeals a more complete description of Goal 14, particuarly with respect to Step 1 of the agency's analysis. Two factors, however, underlie the limited approach taken by LCDC in the Court of Appeals. First, LCDC took the language of the *Wasco County I* opinion, quoted above, as an indication that the court understood and concurred with the basic premise in the agency's interpretation of the goal. In this case, however, the majority opinion implicitly negates that language, and the concurring opinion expressly describes it as 'unnecessary and incorrect.' 67 Or App at 434. Second, for very practical reasons, LCDC's ability to participate in the fairly large number of appeals from LUBA decisions is limited."

The seven factors are set forth in Goal 14:

"Establishment and change of the boundaries shall be based upon consideration of the following factors:

"(1) Demonstrated need to accommodate long-range urban population growth requirements consistent with LCDC goals;

"(2) Need for housing, employment opportunities, and livability;

"(3) Orderly and economic provision for public facilities and services;

"(4) Maximum efficiency of land uses within and on the fringe of the existing urban area;

"(5) Environmental, energy, economic and social consequences;

"(6) Retention of agricultural land as defined, with Class I being the highest priority for retention and Class VI the lowest priority; and,

"(7) Compatibility of the proposed urban uses with nearby agricultural activities."

We analyzed the seven factors in *City of Salem v. Families for Responsible Govt.,* 64 Or App 238, 668 P2d 395, *rev allowed* 296 Or 236 (1983). There, we noted that LCDC has characterized the first two factors as the "need" factors and the last five factors as the "locational" factors. The first two require a city to show a need for the amount of land to be included in the UGB, and the last five require a city to choose and justify which land areas are to be used to satisfy that need. 64 Or App at 243. In short, the only issues are *how big* and *where* the UGB will be.

Thus, once a city exists, it is virtually a foregone conclusion that land will be converted to urban uses. All the city need do is present evidence that people will be moving to the city. This analysis can be confirmed by examining almost any urban area acknowledgment by LCDC. One such acknowledgment, involving the City of Elkton, provides a representative example. *Branscomb v. LCDC,* 64 Or App 738,

---

It may be that, as LCDC suggests, a more complete explanation to begin with would have helped; it also may not have. What is important is that it helps us *now,* and that is what the reconsideration process is for.

669 P2d 1192 (1983), *aff'd* 297 Or 142, 681 P2d 124 (1984). In *Branscomb,* petitioners contended, *inter alia,* that the city had not satisfied the "need" factors of Goal 14. We disposed of this contention as follows:

> "[Petitioners'] fourth assignment is that there was no adequate factual basis demonstrating a need to accommodate long-range population growth and a need for housing, employment opportunities and livability as required by factors 1 and 2 of Goal 14. They also contend that the lack of an adequate factual basis violates Goal 2. Their complaint is that the City, in making population projections, failed to use the 1980 census data. The question is not whether it would have been better if the City had used that data, but *whether there was substantial evidence to support the City's population projections.* There was, as LCDC found." 64 Or App at 744. (Emphasis supplied.)

It thus appears that, contrary to our former approach in this case, at least some urbanization of land is indeed the virtually inevitable consequence of incorporation[6] even without an urban growth boundary.

■■ It is a basic principle of statutory construction that laws should be construed to give effect to the purposes for their adoption. ORS 174.020. In addition, laws should not be construed in a manner that achieves illogical or absurd results. *See, e.g., Hollinger v. Blair/Dickson,* 270 Or 46, 53-54, 526 P2d 1015 (1974). Our decision in this case is subject to some criticism on both of these counts. Its effect is to allow the most basic policies of the land use statutes and goals to be circumvented through the process of incorporation. Essentially, any collection of 150 residents in a rural area would be able to create a city and convert their land to urban uses. *See* ORS 221.020. No unit of government will have the responsibility or

---

[6] There is one possible exception, of a largely hypothetical nature, with respect to the incorproation of new cities. If a city demonstated no "need to accommodate long-range urban population growth requirements" (factor 1), the city could have no UGB. This result could only occur, however, if the city was not seeking or expecting any growth. In its petition, LCDC notes that, of the urban area acknowledgments by LCDC to date involving cities, there has been one such example—the City of Lonerock. City of Lonerock Compliance Acknowledgment Order (Sept. 21, 1978). Lonerock, with a stable or dwindling population of 15, chose to be placed under a rural land use designation administered by the county. Although zero or minus growth may be the harsh reality for a few of Oregon's established cities, it is difficult to understand why a new city would incorporate under such circumstances.

authority to ask *whether* the site of the new city is an appropriate one for urbanization. *See McManus v. Skoko,* 255 Or 374, 467 P2d 426 (1970) (confirming the limited role of counties in reviewing a proposed incorporation, before the current land use statutes). Thus, it will often be easier to form a city than to subdivide or to site commercial development on rural land. At the same time, existing restrictions on development of rural land may be avoided simply by forming a city first.

The combination of *Wasco County I* and *II* results in the ironic and nonsensical situation in which incorporation is a land use decision but one concerning which the basic land use policies, the goals, turn out to have nothing effective to say. Such a conclusion should not be reached unless there is no legal basis for a more sensible and workable conclusion.

Even if the basic assumption in our former opinion were correct—that the UGB establishment process will control urbanization in newly incorporated cities—the result would still be illogical. No purpose would be served in allowing a city to be created, only to have it subsequently determined that the city must be "rural" and therefore is prohibited from offering any of the urban services traditionally provided by city government. A map of Oregon dotted by paper, non-functioning cities could hardly be the result envisioned by the drafters of our land use policies. Under LCDC's interpretation of Goal 14, the justification for creating a new city and allowing urbanization to occur where none has preceded incorporation must be examined *before* the city is created. That is the function of the exception requirement.

This court went on, in *Wasco County II,* to reject LCDC's determination that an exception to Goal 14 could be taken to allow approval of a petition to incorporate. We reasoned:

> "The purpose of a Goal 2 exception to a statewide planning goal is to allow a particular land use that the goal would otherwise preclude, or to alter the way in which the goal would otherwise apply to the use. * * * However, *an exception taken for the limited purpose of permitting the incorporation to proceed would not allow any urban use or urbanization that Goal 14 would otherwise preclude* and would not have any effect on how Goal 14 will later apply to land use actions

involving conversion or urbanization." 67 Or App at 428. (Emphasis supplied; citations omitted.)

As this language indicates, our conclusion was based on our assumption—which we now believe was erroneous—that incorporation in and of itself has no effect under Goal 14.

Requiring those forming a new city to take an exception to Goal 14 will not excuse the newly incorporated city from proceeding to establish a UGB in compliance with the goal. It will, however, require them to deal in the first instance with the very different question of whether there are land use reasons to create the new legal entity in the first place—a legal entity without which no UGB could be established. LUBA and LCDC explained this difference in detail in the order under review:

"Some of the questions asked during the course of the exceptions procedure will mirror questions asked while drawing the boundaries of the city and deciding, pursuant to the seven conversion factors in Goal 14, what urban growth boundaries should be established for the city. The Board believes it is important to note, however, that an urban growth boundary need not be established for a proposed city before the petition for incorporation is approved. The Board understands the rule simply to require an exception to be taken to Goal 14 in order to create the legal entity, a city, without which *the* Goal 14 [is useless] *factors for the establishment of an urban growth boundary cannot be applied.* Certainly, drawing initial city boundaries and answering, particularly, the first two of the exceptions criteria will involve consideration of some of the same issues listed in factors 1 through 7 in Goal 14. For example, land needed for housing, employment, public facilities and services and other urban uses will have to be determined and converted into lines which represent the proposed city boundaries. The Board does not believe, however, that in taking this action there must be an analysis on a scale comparable to that required when drawing an urban growth boundary. A showing by compelling reasons and facts that a city should be allowed, that it should be in the area proposed, that it will not damage the environment, the economic, social and energy qualities of the area, the region or the state and that the city will be compatible with adjacent uses is sufficient for compliance with the rule and approval of an incorporation petition.

"After incorporation, the process of drawing urban growth boundaries and making a comprehensive plan of sufficient

quality to pass an acknowledgment review must be undertaken. There is no way of knowing at the pre-incorporation stage what the urban growth boundaries will be. There may be circumstances in which incorporation of a city will precede by some considerble time any inhabitants or even any construction activities. The Board does not believe it is appropriate or even possible to anticipate all the kinds of situations that may satisfy a Goal 2 exception to Goal 14 for incorporation of a city. Therefore, the formal application of *the* Goal 14 *factors for the establishment of an urban growth boundary* is a separate and distinct activity from the act of incorporation." *1000 Friends v. Wasco County,* LUBA No. 81-132, (1983). (Emphasis indicates language added by LCDC; brackets indicate language deleted by LCDC; footnotes omitted.)

We conclude that our former opinion was in error.

A second consideration, based on administrative law policies, also leads us to believe that our former opinion should be withdrawn. LCDC interpreted Goal 14 to require the taking of a Goal 2, Part II, exception as a prerequisite to incorporation of a city outside an urban growth boundary. Although this requirement is not expressly stated in Goal 14, LCDC has determined that the intent and purpose of the goal requires invocation of the exception process in this context; we declined to follow LCDC's interpretation. Our conclusion, however, was based on a misunderstanding of how incorporation implicates Goal 14. We then erroneously substituted our judgment for that of the agency by making what was, in our view, a "more logical" interpretation of the goal definition of urban land. 67 Or App at 425.

██ The Oregon Supreme Court has not established a rule regarding the level of deference a court of review should grant an agency interpretation of its own regulation.[7] The court has indicated, however, that such an interpretation should be granted appropriate judicial respect. In a discussion of the rationales for according judicial deference to agency interpretations of statutory terms, it has said:

---

[7] Of course, before a court of review will grant deference to an agency interpretation, the regulation itself must be ambiguous. *See Fifth Avenue Corp. v. Washington Co.,* 282 Or 591, 599, 581 P2d 50 (1978). An agency has initial responsibility to interpret and apply its regulations. *See Anderson v. Peden,* 284 Or 313, 318, 587 P2d 59 (1978). The real difference between the dissent (and our former opinion) and this opinion is over the question of whether there is sufficient "play" in the language of Goal 14 to permit LUBA and LCDC to do what was done here.

"There are different grounds for respecting an agency's interpretation when the term appears in a regulation * * * drafted by the agency itself." *McPherson v. Employment Division,* 285 Or 541, 549 n 6, 591 P2d 1381 (1979).

■    There are grounds for judicial respect for LCDC's interpretation of Goal 14. The goal was promulgated by the agency pursuant to a legislative delegation and is within the range of discretion delegated to LCDC. *1000 Friends v. LCDC,* 292 Or 735, 744, 642 P2d 1158 (1982). The goal thus may be said to be a complete statement of "legislative" policy by an agency with specialized expertise, experience and staff. The agency's interpretation of the goal is therefore entitled to "some deference." *Branscomb v. LCDC, supra* 297 Or at 147; *see also Springfield Education Assn. v. School Dist.,* 290 Or 217, 227, 621 P2d 547 (1980) (agency interpretation of law entitled to "an appropriate degree of assumptive validity" where agency involved in writing the law). We agree with LCDC that our former opinion failed to accord LCDC's interpretation of Goal 14 an "appropriate degree" of judicial respect.

■    The Oregon Supreme Court has previously acknowledged that the legislature granted LCDC broad authority to refine state land use policies.[8] Accordingly, judicial review of goals[9] adopted and applied pursuant to that policy is limited to whether the action taken lies within the range of discretion allowed by the general policies in ORS chapter 197. *1000 Friends v. LCDC, supra,* 292 Or at 744. Recognizing the broad powers the legislature granted LCDC, the Supreme Court in *Neuberger v. City of Portland,* 288 Or 155, 168-69, 603 P2d 771, *reh den* 288 Or 585, 607 P2d 722 (1980), signaled its commitment to limit its role in the development and interpretation of land use laws and to defer to those branches of government charged with their adoption and implementation. *See also Norvell v. Portland Area LGBC,* 43 Or App 849, 852, 604 P2d

---

[8] LCDC also has authority to enforce goal compliance. ORS 197.320 to 197.350.

[9] LCDC has been granted authority to adopt "goals" and "rules." ORS 197.040(1)(b); 197.040(2)(a); 197.225. Goals are adopted and amended through special procedures, ORS 197.235 to 197.245, which are more rigorous than those provided by the Administrative Procedures Act for adoption of administrative rules. ORS 183.335. This court has concluded that the goals occupy a preferred positon over LCDC rules and that the goals may not be amended by a rule. *Willamette University v. LCDC,* 45 Or App 355, 374, 608 P2d 1178 (1980).

896 (1979). LCDC necessarily has gained considerable expertise in administration and interpretation of Goal 14. *See Haviland v. LCDC,* 45 Or App 761, 765-66, 609 P2d 423 (1980).

■■ Of course, the agency's power, and the expertise with which it is exercised, must be balanced with this court's statutory scope of review. In pertinent part, ORS 197.850(9) provides:

> "The court may affirm, reverse or remand the order. The court shall reverse or remand the order only if it finds:
>
> "(a) The order to be unlawful in substance * * *."[10]

This limitation on this court's power to review LUBA decisions demonstrates the legislature's intent to confine appellate review to whether an LCDC interpretation lies within the policy reflected in the goal interpreted. Accordingly, if LCDC's interpretation and the reasoning supporting it is clearly expressed in an order or a rule, and if *that interpretation is plainly consistent with the intent and policy of the goal,* a court of review must affirm. Under the circumstances here, we were not at liberty to interpret the goal differently, and we erred in doing so.[11]

Our new disposition of the principal issue in this case requires us to touch on other issues that our former opinion either dealt with summarily or was not required to deal with at all. We shall address those briefly.

1.   As it was first before us, this case involved, not only challenges to LCDC and LUBA's interpretation of Goal 14, but also a temporary rule adopted by LCDC after *Wasco County I* that purported to govern the application of the goals to the incorporation of new cities. OAR 660-14-000 *et seq.* The rule contains a retroactive application date. *See Wasco County II,* 67 Or App at 420-21. Concerning the rule, its application and Goal 14 generally, we said, 67 Or App at 421:

---

[10] The "unlawful in substance" standard is the functional equivalent of the "erroneous interpretation" standard of ORS 183.482(8)(a). *See Springfield Education Assn. v. School Dist., supra,* 290 Or at 224 n 5; *see also West Hills & Island Neighbors v. Multnomah Co.,* 68 Or App 782, 683 P2d 1032 (1984).

[11] It follows from this analysis that we would also have been bound had LUBA and LCDC originally taken the view that we took in our former opinion. The point is that the decision lay within *their* discretion, not ours.

"LUBA concluded that the county was required to apply the LCDC rule and directed that the county do so on remand. LUBA also concluded that the county's decision violated Goal 14 and Goal 3. Petitioners assign error to each of those conclusions. Their threshold contentions are that the LCDC rule was improperly adopted, that it cannot be applied retroactively to this incorporation decision made before its promulgation and, for various other reasons, that it is invalid facially or as applied here. LCDC disputes those contentions. However, it also argues that the rule simply reiterates previous LCDC interpretations of Goal 14 and that LUBA's order can be sustained as a correct application of Goal 14 independently of the rule. We agree to a limited extent with LCDC's suggestion that the validity of the rule and its application can be superfluous to our decision. If the interpretation of Goal 14 in LUBA's order is erroneous and if the rule embodies the same error, it is unnecessarily for us to consider now any of the other defects petitioners ascribe to the rule." (Footnotes omitted.)

We still believe that the validity of the rule is irrelevant, because we now hold that Goal 14 *as written* permits the ruling LCDC and LUBA made here.

2. Both sides of this controversy assigned error to LUBA's application of Goal 3, the agricultural land goal. What we said concerning the clarity and correctness of LUBA's order in that regard was accurate. *See Branscomb v. LCDC, supra.* However, in view of the sweep of our holding concerning Goal 14, LUBA's error in this regard does not require remand to LUBA.

3. We also adhere to our statement that:

"Most of the remaining assignments in the appeal and the cross-appeal require no discussion, either because they are necessarily disposed of or rendered moot by what we have said here or elsewhere, or because they are without colorable merit. * * * As their analogs did in *1000 Friends of Ore. v. Wasco Co. Court, supra,* petitioners make a multifaceted constitutional attack on the application of the land use laws to them and on the procedures followed in this case. The constitutional arguments require little comment at this time. Petitioners state that they are members 'of a protected class of citizens' and 'of an unpopular minority religion.' It suffices for the moment to note that no party or agency asserts in this appeal that any

limitation on petitioners' ability to incorporate is attributable to their religious affiliation." 67 Or App 418.

4. None of the remaining assignments of error propounded by any of the parties requires discussion.

The sole remaining question is one of remedy. We have found that LUBA's *disposition* in this case was correct, although its *rationale* was not. (LUBA had remanded under LCDC's temporary rule, rather than under LCDC's construction of Goal 14 as written.) We therefore see no reason to remand to LUBA again. LCDC's view as to the applicability of Goal 14 which it has advanced to us and which we have adopted would make any such action a needless exercise. We therefore affirm LUBA's remand to the County, modifying it only to instruct the County to consider the incorporation of Rajneeshpuram under Goals 14 and 2, not the temporary rule.

Petitions for reconsideration allowed; former opinion withdrawn; affirmed as modified.

**RICHARDSON, J.,** dissenting.

It remains my view that the analysis and disposition in our former opinion were correct, and I would adhere to that opinion. Because our former opinion is published and available to the Supreme Court, the preceding sentence may be sufficient unto the day. However, I think that today's majority opinion and LCDC's petition for reconsideration—which the majority essentially duplicates—call for comment.

The crux of the majority's disagreement with our former opinion is its understanding that we there

" that Goal 14 controls the conversion of rural land to urban uses only through the specific process of establishing an urban growth boundary. * * * Our conclusion was based on the fundamental assumption that 'urbanization of rural land is [not] the inevitable consequence of incorporation,' because Goal 14's requirements for a UGB control such conversion. * * * Without this assumption, it would have been impossible for us to conclude, as we did, that incorporation does not violate the urbanization and conversion provisions of the goal. * * *" 68 Or App at 770. (Citations omitted.)

The majority stands the reasoning of our former opinion on its head. The *basis* for our conclusion was the language of *Goal 14,* not any assumptions about the *abstract*

relationship between incorporation and urbanization. What we are called upon to do in this case *is* to interpret Goal 14. The goal says nothing about incorporation, and the only mechanism it creates to regulate the urbanization of rural land—the urban growth boundary (UGB) process—was not designed to apply and is mechanically incapable of application to a decision to incorporate a city.

LCDC and the majority appear to agree that the goal's *UGB process* is irrelevant to incorporation, but they nevertheless consider the goal to be applicable. They begin with the assumption that incorporation can have urbanizing effects that the UGB process is inadequate to prevent. They then *postulate* that it necessarily follows from that assumption that Goal 14 *does* regulate incorporation independently of its UGB mechanism, and they launch into a labored analysis of why that independent regulatory effect should be ascribed to the goal. However, they do not identify where in Goal 14 that effect is to be found. What the majority and LCDC never do is look at the goal's language and recognize the simple fact that the goal contains nothing except the UGB process to govern the urbanization of rural land.

That failure of recognition infects all of LCDC's arguments and all of the majority's reasoning. The majority states, for example, that our former opinion exceeded our scope of review and failed to accord appropriate deference to LCDC's interpretation of the goal it promulgated. However, as the majority notes, "before a court of review will grant deference to an agency interpretation, the regulation itself must be ambiguous." 68 Or App at 775, n 7. There is no ambiguity in Goal 14 that can support LCDC's interpretation that the goal regulates or applies to incorporation. None of the cases the majority cites in its discussion of judicial deference and related concepts suggest that a court must or may sanction what LCDC is effectively doing here, *i.e.,* amending its goal in the guise of interpreting it.

For similar reasons, no responsible credence can be given the majority's statements to the effect that our former opinion's conclusion that Goal 14 does not apply to incorporation was an absurd or illogical construction of the goal and was not a "sensible and workable conclusion." 68 Or App at 773. It is of course correct that, to the extent consistent with the

language of statutes and rules, courts should construe them sensibly and consonantly with their objectives. However, it is even more axiomatic that courts cannot insert provisions into statutes or rules that have *no* predicate in their language. It may be that the regulatory scheme LCDC articulates in its petition for reconsideration is better than the one it promulgated through its goals, but that is an idle inquiry. Oregon's statutes provide a clear procedure for the amendment of the goals and of other agency rules. That procedure notwithstanding, LCDC's petition in effect invites us to adopt an interpretation of Goal 14 that is totally at odds with its language, and the majority obliges LCDC.

I note finally that I do not share the majority's and LCDC's assumption that the UGB mechanism of Goal 14 is inadequate to guard against the inappropriate conversion of rural land to urban uses. Our opinion in *Perkins v. City of Rajneeshpuram,* 68 Or App 726, 686 P2d 369 (1984), read together with our former opinion and *Roth v. LCDC,* 57 Or App 611, 646 P2d 85 (1982), demonstrates that the goal's UGB provisions can be construed and applied to prevent post-incorporation urbanizing events of the kind the majority and LCDC assume inevitably follow from incorporation. *Perkins* therefore also demonstrates that the majority and not our previous opinion has failed to interpret the goal logically and in a way that makes it workable: The majority finds it necessary to add something to the goal that has no foundation in its language only because the majority fails to recognize that the language the goal does contain is quite susceptible to an interpretation that achieves the goal's purpose.

I dissent. Joseph, C. J., and Warren and Rossman, JJ., join in this dissent.